```
1                 UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2
                                      Civil Action
3                                     No. 07-12166-WGY

4
    * * * * * * * * * * * * * * * * * * *
5   NIKKO ROSE and BRANDON ROSE,         *
    on behalf of themselves and all others *
6   similarly situated,                  *
                                         *
7              Plaintiffs,               *
                                         *
8   v.                                   *   HEARING
                                         *
9   RUTH'S HOSPITALITY GROUP,            *
    INC.,                                *
10                                       *
               Defendant.                *
11  * * * * * * * * * * * * * * * * * * *

12

13           BEFORE:  The Honorable William G. Young,
                          District Judge
14
    APPEARANCES:
15
                 LICHTEN & LISS-RIORDAN, P.C. (By Shannon E.
16      Liss-Riordan, Esq. and Hillary A. Schwab, Esq),
        100 Cambridge Street, 20th Floor, Boston,
17      Massachusetts 02114, on behalf of the Plaintiffs

18               NIXON PEABODY LLP (By David S. Rosenthal,
        Esq. and Jeffrey B. Gilbreth, Esq.), 100 Summer
19      Street, Boston, Massachusetts 02110, on behalf of
        the Defendant

20

21

22

23
                                      1 Courthouse Way
24                                    Boston, Massachusetts

25                                    October 2, 2009
```

 1              **THE CLERK:**  All rise.  Court is in session, please

 2    be seated.

 3              Calling Civil Action 07-12166, Rose v. Ruth's Chris

 4    Restaurant.

 5              **THE COURT:**  Good morning.  Would counsel identify

 6    themselves for the record.

 7              **MS. LISS-RIORDAN:**  Good morning, your Honor.  For

 8    the plaintiffs, Shannon Liss-Riordan.

 9              **MS. SCHWAB:**  And Hillary Schwab.  Good morning,

10    your Honor.

11              **MR. ROSENTHAL:**  For the defendant, David Rosenthal.

12              **MR. GILBRETH:**  Jeff Gilbreth, your Honor.

13              **THE COURT:**  Yes.  Good morning.

14              First, let me apologize to you that I was not as

15    well prepared for the final pretrial conference I think as I

16    ought to have been and to say that I now recognize what you

17    said orally -- I hold them off the record in the lobby --

18    about how important it is to have explicated this tip

19    producing sidework dichotomy for the proper management of

20    this case.  I've got some other things I want to talk about

21    and resolve on the record, but that is a central problem and

22    you properly recognize that the proper resolution of that

23    issue may well, and institutionally I express the hope that

24    it will, result in a private resolution of the case.

25              So, I've prepared as best I can.  And I see the

1    issue not as a question of law or a question of fact but a

2    mixed question of law and fact, by which I mean it's

3    necessary to go beyond the statute, and in this case the

4    regulations, to explicate in the circumstances of this

5    particular case what we mean by tip producing and sidework.

6    That is law explanation.  That's for the judge.  Hopefully

7    at the end of the argument we'll have this morning, I'll be

8    able to make that declaration.

9           Now, what the jury does with that, how they apply

10   that to whatever evidence is produced in the case and how

11   they quantify it, which is going to be important, those are

12   facts and those are for the jury.

13          I say that simply to set up the argument, and I

14   think we should hear first from the plaintiff.  And it makes

15   sense to me to have you argue what is sidework and leave it

16   at the, and then figure that everything else is tip

17   producing.  So I want to know what's sidework, and we'll say

18   at least while a person's there working the rest of it's tip

19   producing.

20          So, if that's what I need explained to me, Ms.

21   Liss-Riordan, I'll hear you.

22          **MS. LISS-RIORDAN:**  Thank you, your Honor.

23          **THE COURT:**  First of all, does that make sense?

24          **MS. LISS-RIORDAN:**  I think -- excuse me.  I think

25   it does make sense.  This could be treated as a mixed

1    question of law and fact.  What we have argued and what I

2    believe is stated in the regulation and the Department of

3    Labor handbook interpreting the regulation is that there is

4    a distinction made between work that is clearly directly tip

5    producing and work that is incidental to tip producing

6    activities.  And the language of the reg. itself recognizes

7    this, or the language of the regulation as well as the

8    language of the operations handbook even more explicitly

9    recognizes this.

10           In the regulation, the regulation refers to a

11   waitress who spends part of her time cleaning and setting

12   tables, toasting bread, making coffee, and occasionally

13   washing dishes or glasses.  Later in the regulation it

14   refers to these related duties.  Such related duties in an

15   occupation that is a tipped occupation need not by

16   themselves be directed toward producing tips.

17           So the regulation itself seems to recognize that

18   those types of duties are not directly tip producing.  So we

19   contend are non-tip producing sidework duties, or all of

20   these types of duties are incidental to a waiter or

21   waitress's duties, duties such as cleaning, setting tables,

22   toasting bread, washing dishes, washing glasses.  And it

23   describes in a number of places and I think perhaps most

24   concisely in our statement of the joint pretrial memo what

25   the types of duties are that we are saying constitute these

1    non-tip producing sidework duties.

2         **THE COURT:**  All right, start, start ticking them

3    off.

4         **MS. LISS-RIORDAN:**  Okay.  I'm looking at our

5    pretrial memo, the plaintiffs' statement, sidework tasks

6    include stocking and restocking dishware, glassware,

7    utensils, stocking and restocking coffee, tea, milk,

8    condiments and juices and mixers, polishing glassware and

9    silverware, cleaning various areas of the restaurant.

10        **THE COURT:**  Well, hold off on the polishing for a

11   moment.

12        All right.  Stocking and restocking.  Now,

13   polishing.  When waitstaff are not directly waiting on

14   tables -- the classic example is the bartender.  A

15   bartender, a good bartender is constantly tending to the

16   bar.  If nothing else, he's polishing the glasses and he's

17   putting the glasses back up in the racks.  But if there are

18   any patrons at all at the bar, if he's a good bartender,

19   he's engaging them in conversation if it looks, I shouldn't

20   say, I could use the male gender, she's engaging them in

21   conversation, if it looks to her like they want to talk.

22   And their needs, their glass is empty, for example, trumps

23   anything else he's doing.  He's going to offer anyway to

24   refill the glass.

25        Now, I'm struck by this, I know this is just one of

1    the many cases here, but this Pellon v. Business

2    Representation, 528 F.Supp. 1306, my colleague in the

3    Southern District of Florida.  I don't propose to get too

4    detailed here.  So, I stopped you there because I think all

5    of that's tip producing.  It's all tip producing.  Because

6    she's there at her work station tending to the bar, and

7    everything she does there, with patrons at the bar, or even

8    waiting for patrons to come to the bar, is tip producing.

9            You disagree with that?

10           **MS. LISS-RIORDAN:**  I do disagree.  Let me, let me

11   step back and maybe just answer your question a different

12   way.

13           **THE COURT:**  Okay.

14           **MS. LISS-RIORDAN:**  You wanted me to tick off the

15   particular duties.

16           **THE COURT:**  I do.  Well, then skip that because I

17   was -- it's obvious I was with you on the first two, and

18   subject to what Mr. Rosenthal says.  So skip that.  I've got

19   a problem with that one, go on with others.

20           **MS. LISS-RIORDAN:**  If I could, instead of ticking

21   through all the duties that were listed, if I could just

22   come at it a different way --

23           **THE COURT:**  All right.

24           **MS. LISS-RIORDAN:**  -- and that way I would like to

25   distinguish the Pellon case --

1          THE COURT:  All right.

2          MS. LISS-RIORDAN:  -- because I think it's very

3     distinguishable.

4          THE COURT:  Right.

5          MS. LISS-RIORDAN:  In the restaurant industry and

6     at Ruth's Chris in particular there are easily segregable

7     duties that are called opening sidework and closing

8     sidework, and then there's also running sidework.  So,

9     opening sidework is what the waitstaff do when they get to

10    work before customers come in.  There's no customer contact,

11    there are no customers.

12         THE COURT:  Now, this is helpful.  Where do I find

13    that?  I mean, is that in their manuals?

14         MS. LISS-RIORDAN:  It's -- well, it's in the

15    testimony of pretty much everyone.  It's undisputed, I

16    believe, I believe it's -- I mean, there are descriptions of

17    the sidework that's necessary in Ruth's Chris manuals.  But

18    I believe --

19         THE COURT:  All right, let me, let me try to focus

20    you.

21         MS. LISS-RIORDAN:  Let me step --

22         THE COURT:  Because I'm open to be persuaded.  But

23    subject to what Mr. Rosenthal says, I think opening sidework

24    is sidework.  And I think that covers, for instance,

25    everything it takes to get the restaurant ready for its

 1    hours of operation, or if it has a break between lunch and

 2    dinner for its, let's say for its dinner rush.  And that's

 3    laying the tables and I'm sure lots of other things.  And

 4    subject to what he says, I'm with you on closing sidework.

 5    That is, when we're at an end and we're not resetting the

 6    tables, there's no other, the patrons at least on these

 7    tables are gone and there's a few tables left and you're

 8    setting that up for the next day if it serves only one meal

 9    or doing whatever they do, sidework.

10         It's running sidework that I'm having difficulty

11    with.  Because in my preparation for this hearing, I have

12    become convinced, I think, that interaction with the

13    customer is the key to tip producing activity and

14    interaction with the customer broadly conceived.  That is to

15    say, and I do want to hear you talk, there are times,

16    beginning of a shift, any restaurant, good restaurants, and

17    we'll take Ruth's Chris is good, they're open for dinner,

18    when, 5:00, 5:30.  Now, it's been my experience that if I'm

19    willing to eat that early, I can always get a table, even in

20    a good place.  And sometimes my wife and I have been the

21    first ones there.  So we go in and we are taken care of, but

22    there's more waitstaff than necessary to take care of us and

23    they stand around hoping for the next customer and for all I

24    know polishing.  But sometimes I find them standing around.

25    It doesn't trouble me.  But I'm telling you it seems to me

1    that's all tip producing.  They're there on the line ready

2    to, to interact with customers, which I think is the, it's

3    not what I think, which I believe the cases and regulations

4    support is the tip producing thing.  I don't think all work

5    during the shift is tip producing.

6         Now, move me off that, or focus on that.  Because

7    I'm with you at the beginning, I'm with you at the end,

8    subject to what Mr. Rosenthal says.

9         **MS. LISS-RIORDAN:**  I agree with what you said a

10   hundred percent until about sentence and-a-half ago.

11        **THE COURT:**  All right.

12        **MS. LISS-RIORDAN:**  Yes, we, we contend that the

13   opening sidework and the closing sidework are non-tip

14   producing and what we say is that we have evidence that that

15   alone, even if you leave running sidework out of it, we've

16   exceeded 20 percent.

17        **THE COURT:**  But that's, that's not my concern here.

18        **MS. LISS-RIORDAN:**  Yes.  Yes.  So that's why we

19   said we get to the jury.

20        Now, running sidework, I do agree, is the closer

21   question and that's where I think the mixed law and fact

22   comes into play.  And the reason that I was going to say

23   that the Pellon case is distinguishable is in Pellon the

24   skycaps were doing what they allege was non-tip producing

25   and tip producing all mixed up through their shifts.  Minute

1    by minute they were saying when the --

2          **THE COURT:** I understand. I focused on that case

3    and I see how the judge dealt with it.

4          **MS. LISS-RIORDAN:** Yes. Right. Right. And the

5    court there even distinguished a case of a waitress for

6    which there is more easily distinguishable opening and

7    closing work.

8          So, what we're saying is that the opening sidework

9    and the closing sidework is non-tip producing. As a matter

10   of law we get to count that into our 20 percent. For the

11   running sidework, I do believe that's a jury issue how much

12   time during the course of a shift do we also get to count

13   into that. And I think that's where the jury question is.

14   Because we're saying that what is tip producing is exactly

15   what you said, what involves engagement with a customer or

16   being there and available for the customer. A lot of the

17   running sidework involves the waiters having to go into the

18   back and take out the trash, and then they're disappeared

19   from the restaurant for a little while. So that type of

20   work I think, if they have to spend, say, ten minutes an

21   hour taking out trash, if that's their running sidework duty

22   for that day, I think that would count as non-tip producing.

23   But I think that's where we get into more the mixed

24   questions of law and fact.

25         What we're saying is that we believe we can win

1    this case even if we could only rely on opening and closing

2    but we also get to count some running.

3            **THE COURT:**  Though counsel sometimes may get a

4    misapprehension, I don't think I'm king of the universe

5    here.  And my function this morning, better prepared than I

6    was when we were just talking about how we were going to

7    manage this case, is to try to figure out how to do the

8    judge job.  So what you're trying to aid me now is what

9    guidance I'm going to tell the jury as the case begins.

10   Then I will be quiet.  And you can -- relatively.  And you

11   will put on your case.  But I'm trying to do the traditional

12   judge job of law explaining.

13           Now, you've gotten taking out the trash.  I need to

14   know.  Because I don't want to argue about this in the

15   course of the trial.

16           Let me try -- I was willing to give you one other,

17   now, all subject to what Mr. Rosenthal says.  Restaurants

18   hope to turn over their tables, there may be better language

19   than that, but turn over their tables a number of cycles

20   depending upon whether it's McDonald's fast food or it's a

21   pre-fixed menu restaurant, a number of cycles during the

22   dinner hour.

23           Now, clearly, or in my mind busing the table

24   between courses is all tip producing.  The customer's there.

25   The person takes my dinner dishes.  Someone asks me if I

1   want, and my wife, if I want dessert.  We decline.  And then

2   someone comes and gives the check.  But all that's tip

3   producing.

4          Now, the table is what it is when we leave the

5   table to depart the restaurant.  Then someone comes, takes

6   the table cloth off, rearranges the thing and sets it again.

7   Now, that had to be done in the startup.  So I was willing

8   to give you, it seems to me, that time.  Because that's the

9   same function as in the startup.  And I'm gone.  The tip

10  I've left has been left.  It's not going to enhance the tip

11  that I give, and of course the restaurant wants to look good

12  with all its tables set.  And that's how it looked at the

13  beginning of the shift.  And that ambiance of lovely linen

14  and cutlery and wine glasses is the ambiance the restaurant

15  wants, and everybody gets better tips one hopes because of

16  that.  And then when my successors, who eat a little later,

17  come in, or who have the reservations that I neglected to

18  get, come in, that's the same thing as at the start of the

19  shift.  So I was willing to give you that.

20         Now you're telling me taking out trash.  What else?

21         **MS. LISS-RIORDAN:**  Well --

22         **THE COURT:**  During the shift.

23         **MS. LISS-RIORDAN:**  Well, I could give you a list of

24  activities, but I thought what you were looking for was a

25  dividing line to explain it to the jury.  And I think --

1          THE COURT:  I guess I've given it to you.

2          MS. LISS-RIORDAN:  Okay.

3          THE COURT:  That's what I think it is.

4          MS. LISS-RIORDAN:  Okay.

5          THE COURT:  And that would be my one example,

6     setting tables.

7          MS. LISS-RIORDAN:  I think the dividing --

8          THE COURT:  Do you think I've gone far enough?

9          MS. LISS-RIORDAN:  I think the dividing line is

10    things that actually bring the waiter into direct customer

11    contact with the customer or makes, makes them available.

12         THE COURT:  Well, now, a waitress in the lounge

13    area takes my drink order.  Goes to get the drink.  I mean,

14    they work it different ways.  If it's a fancy mixed drink,

15    she may have to defer to the bartender to make it.  But his

16    speed in making it is -- I don't want to wait an inordinate

17    amount of time for the drink.  On the other hand, if I'm

18    having sparkling water she'll punch that out herself and

19    then she'll be back.  All of that's tip producing.

20         Do you agree?

21         MS. LISS-RIORDAN:  I do, because that involves

22    serving food or drink to the customer, even during the few

23    minutes she's away getting the drink.

24         THE COURT:  Well, the fancy drink, that involves

25    preparing it.

1      **MS. LISS-RIORDAN:** Yes. Yes. I do agree with

2   that. So the types of examples that I would say are non-tip

3   producing that happen during the course of the shift are

4   things like taking out the trash, having to go into the back

5   to stock dessert spoons during downtime during a shift,

6   which isn't producing tips from anyone in particular.

7      **THE COURT:** All right.

8      **MS. LISS-RIORDAN:** Work, work that's done outside

9   of the presence of the customers and that's not involved in

10  getting food or drink to any particular customer being

11  available.

12      **THE COURT:** Well, I'm not so sure I'm going to get

13  to that level of detail. I like resetting the table in the

14  absence of a customer, taking out the trash, and then I'll

15  leave it to the jury. I think --

16      **MS. LISS-RIORDAN:** I think that will be --

17      **THE COURT:** So, if we leave it there --

18      **MS. LISS-RIORDAN:** Yes.

19      **THE COURT:** -- I'm ready to hear from Mr. Rosenthal

20  who may not agree with this. Is that right?

21      **MS. LISS-RIORDAN:** Yes. There's just one other

22  thing that I just wanted to point out. The one thing that I

23  had disagreed with in what you said earlier before I started

24  talking was you said that you agreed that the work that was

25  done before customers get to the restaurant is opening

1    sidework and that's a separate category that's not tip

2    producing.  You said that when a customer such as yourself

3    gets there early and there's one table there and --

4         THE COURT:  Not early -- yes, okay.

5         MS. LISS-RIORDAN:  Say at the -- say right when the

6    restaurant opens.

7         THE COURT:  Correct.

8         MS. LISS-RIORDAN:  There's a line of waitstaff

9    waiting to serve.  The only dispute that I would have with

10   what you said there is that the way it works is that a

11   particular waitstaff are assigned a particular table.  That

12   line of waitstaff who are waiting, they're still doing

13   opening sidework and they're not going to come and help you

14   because you're not at their tables.  So I would say that

15   that's still opening sidework until they get their first

16   table.

17        THE COURT:  I have to tell you, I disagree with

18   that.

19        MS. LISS-RIORDAN:  Well, I think that's a fact --

20        THE COURT:  The restaurant's open.

21        MS. LISS-RIORDAN:  -- issue for the jury.

22        THE COURT:  Well, I propose to take that from the

23   jury.  So, that we have a disagreement on.  The restaurant's

24   open.  They're there on the line.  As soon as a customer

25   appears for that table, that's, that's their be all and end

1   all.  They're like the client of an attorney.  Zealous

2   service then for that table.  All restaurants would want

3   that.

4        **MS. LISS-RIORDAN:**  I agree with that, absolutely.

5   I'm saying that everyone who's not assigned to that table

6   who's still waiting for their first table is still engaged

7   in opening sidework until their first table arrives, because

8   they're still polishing silver and setting up the tables.

9        **THE COURT:**  No, you see, this polishing business I

10  don't go for.  Because my analogy is that's the same thing

11  as the bartender who is polishing both to look busy and

12  obviously to keep the bar sparkling, but who knows that her

13  primary goal is to serve that person who plants himself on

14  the barstool.

15       All right, let's hear Mr. Rosenthal.  How much of

16  this as we've engaged do you disagree with?

17       **MR. ROSENTHAL:**  I disagree with the notion that

18  opening sidework as you defined it, that is, before the

19  folks get into the restaurant, is not tip producing.  And I

20  say that for a couple of reasons.  Number one is, the people

21  who actually do the job have said that it's tip producing

22  over and over and over again.  That's the record before the

23  Court.

24       **THE COURT:**  But you see you're the one, I thought,

25  who was arguing that this was a legal issue.  To the extent

1   that I'm explaining it, you see -- and of course I'm laying

2   myself open.  I can be reviewed de novo on this.  I think

3   the regulations and the examples they give make, I don't --

4   in short, and respectfully, I don't care what they say.  The

5   regulations say and give the examples which leads me to

6   believe that opening sidework is just that, sidework.

7   Everything has to be polished.  It has to be restocked.  The

8   tables have to be laid and have to be sparkling.

9           What am I missing?

10          **MR. ROSENTHAL:**  Again, your Honor, respectfully, I

11  disagree.  This has to be a fact issue.  Because what goes

12  on in this particular restaurant is certainly not dealt with

13  in these regulations.

14          **THE COURT:**  But you see that's always the problem

15  of legislation.

16          **MR. ROSENTHAL:**  Exactly, and that's why I say it

17  has to be a fact issue.  All they're giving here, Judge --

18          **THE COURT:**  The fact that legislation -- take a

19  very successful piece of legislation, the Sherman Act --

20          **MR. ROSENTHAL:**  Yes.

21          **THE COURT:**  -- is very short, about seven lines,

22  and it says thou shalt not monopolize.  Well, there's all

23  sorts of common law that explains that.  And at this, the

24  trial level, judges, because I'm guided by it, I'm

25  controlled by it, I have to figure it out.  Well, here we

1    have a more complex statute and an even more complex

2    regulation.  But the fact it doesn't say everything doesn't

3    mean I just say, well, it's what the regulation says, go and

4    figure it out.  My job is to explain it to the jury.

5              **MR. ROSENTHAL:**  I hear you, Judge.  And let's take

6    a look, let's deal with the regulation for just a moment.

7    We're talking about 531.56(e).  Okay?  We've got to remember

8    that this regulation arises out of an analysis of what is a

9    dual job.  That's really all it discusses.  It then uses the

10   example of a waitress.  Okay?  And the issue is whether or

11   not performing related work can be compensated at the tip

12   credit.  That's all it does.

13             Now, the regulation doesn't say that it is tip

14   producing.  What it says is it need not be.  Those are very

15   important words, Judge.  Need not be tip producing.  So, it

16   may be, it may not be.  This regulation does not purport to

17   decide at every single restaurant whether or not in a given

18   case that work, as an example, just as an example, is tip

19   producing or not.

20             You know, one of the things that's occurred to me

21   as I've thought about this since last Friday is that all

22   they do is use a couple of examples.  Okay?  Does that mean

23   that the other 25 items of sidework can be tip producing

24   because someone might read it to be not tip producing?  I

25   mean, that points up the absurdity of the argument.  I'm not

1  saying that.  But all we have here, Judge, are examples.

2  That's all.  And we have examples used in the context of

3  trying to figure out what a dual job is and under what

4  circumstances you can get a tip credit or not get a tip

5  credit.  It would, respectfully, your Honor, be I think an

6  enormous extension of either the regulation or the field

7  operations handbook, which by the way is not binding.  The

8  case law is all over that issue very clearly.  It is not

9  binding.

10      And one of the things that I would like to point

11  out to the Court is that if you look at the cases which the

12  plaintiffs cite, and I know you have, and look at the cases

13  where, that they cite for the motion that you should look at

14  the, at the field operations handbook.  What each one of

15  those judges does in those cases is that they take a look at

16  the regulation and then they do a detailed factual analysis

17  to see whether or not it fits.  There would be no reason to

18  do that detailed factual analysis in any one of those cases

19  if in fact as a matter of law those examples decided the

20  issue.  And, you know, obviously the procedural posture of a

21  case is all important.  We're always saying that to

22  associates to do research for us, what is the procedural

23  posture here.  Is it summary judgment, is it at the trial,

24  et cetera.  And what every one of these judges has done is

25  they say, okay, here's what it says, now let me take a look

1    at the facts on this particular case.  It's simply not

2    binding.

3            Now, apart from that, Judge, let's take a look at

4    what they actually talk about here.  They talk about making

5    coffee.  Okay?  And this I think goes to this issue of

6    opening as opposed to while they're there.

7            Nikko Rose, the named plaintiff in this case, told

8    me, okay, that when she makes a pot of coffee for a

9    customer, while that customer is in the restaurant, that's

10   tip producing work.  Okay?  Now, she also makes a pot of

11   coffee at 4:55, for you and your wife if you happen to show

12   up at five o'clock.  Because you want coffee quickly,

13   freshly, immediately, in a nice restaurant like that, just

14   as much as the guy who wants it at eight o'clock at night

15   when he's finished his dinner when he came into the

16   restaurant at six o'clock.

17           I don't understand how tip, making that pot of

18   coffee for the first guests, before they arrive, cannot be

19   tip producing and have it be tip producing if it's done

20   later on during the course of the meal.

21           If you look at the other examples that they give,

22   polishing glasses.  I asked every one of these folks, Judge,

23   how important that is.  And they talk about the importance

24   of the first impression when the people walk in.  The

25   affidavits and the depositions talk about how important it

1    is to make that important first impression.  And they say if

2    I can make that important first impression then I'm well on

3    my way to earning tips, a larger tip, for my, for my, for my

4    work in my little business, my little section of the

5    restaurant.

6            Now, as I said in our brief, how does that happen?

7    Do those glasses appear magically?  They're there.  They're

8    there because somebody as a matter of his sidework made that

9    table perfect, made that, made that table perfect.  But then

10   I asked him what happens, Judge, what happens, Ms. Rose, or

11   Mr. Rose, or Mr. Langevin, what happens if you miss

12   something and you've got to, you put your thumb there and

13   somebody says, hey, this is a, this is a dirty glass.  He

14   said, well, I got to go get, I got to go get a new one.

15   Well, where do you go to get the new one?  Well, I go to the

16   service station.  Where's the service station?  Well, right

17   next to the, right next to the forks.  Okay?  And why do you

18   go -- how do you do it?  Do you get around to it or -- he

19   says oh, no, I have to do it immediately because that's

20   what's expected.  Okay.  So, having it in that -- and was it

21   somebody's sidework duty when the restaurant opened, before

22   the restaurant opened, Judge, before the restaurant opened,

23   was it somebody's duty to stock that glass.  Yes.  That's

24   right, that's one of the sidework duties we do before people

25   come into the restaurant.  All right, what happens if that

1    clean glass hadn't been there.  Well, I would have had to go

2    to the kitchen.  Well, where's the kitchen?  Well, that's

3    downstairs.  Where in the kitchen do you go?  I have to go

4    to the dish drawer to get it.  What do you do?  Well, then I

5    have to get it out, I have to look at it to make sure and

6    polish it.  So, during that time you're not there to service

7    your clients, are you?  No, I'm not.  It's going to take

8    longer, isn't it?  Yes.  Could that affect the amount of the

9    tip that you receive?  Absolutely.  That was their testimony

10   every time.

11          And I asked them the same question about a dirty

12   glass.  I asked them the same about a dirty dish, about a

13   dirty fork, about a dirty knife.  It's, it's -- you just

14   can't do the job without all of that preparatory work that

15   goes into making the first guest experience just as good as

16   the second or third or the first.

17          Now, you make a good point about turning over the

18   tables.  That's one of the examples I wanted to use today.

19   I asked them that question.  I said, well, you turn over

20   these tables as quickly as you can, don't you?  Yes.  Why?

21   Well, I want to get -- we want to get as many turns as

22   possible.

23          What other reasons do you do it quickly?  Well,

24   we've got people waiting out in the, out in the lobby.  And

25   chances are if it's a busy night they've been waiting for a

 1    long time.  So you want to get them in as quickly as

 2    possible so that they're not annoyed.  Absolutely.  Ms. Rose

 3    said nobody likes to wait in a restaurant.  Okay?

 4         Now, how do you -- what is it that enables you to

 5    turn that table quickly?  Mr. Rose said, well, we have

 6    everything ready to go.  What do you mean by that?  We have

 7    in that service station, because somebody stocked it during

 8    his sidework duties, before the restaurant opened, he

 9    stocked clean napkins and they folded the napkins.  I asked

10    Mr. Rose, well, if those napkins weren't there where would

11    you go for them?  I would have to go down to the kitchen.  I

12    would have to go down to the basement there they're in great

13    big bags because they've come back from the cleaners.

14         So, the clean glasses, the clean silverware, the

15    clean plate work is all there, and they literally --

16              **THE COURT:**  Okay.

17         **MR. ROSENTHAL:**  -- come out, come out in a tray.

18    So, that's why I disagree, Judge, that the --

19              **THE COURT:**  I understand the argument.  In one

20    respect it does resonate with me.

21         He argues, Ms. Liss-Riordan, and I think

22    persuasively, that the restocking, relaying tables, in the

23    course of the shift, is tip producing.  In other words,

24    making -- I liked, I liked his making coffee argument.  If

25    part of it is to have the steaming coffee ready to go at

```
 1    5:00, because the restaurant opens at 5:00, even though

 2    nobody's there, how is that different than getting a

 3    steaming cup of coffee during the shift?

 4         Now, despite his argument, I'm still thinking

 5    pre-shift, pre-shift preparation, stocking, restocking,

 6    that's sidework, post-shift.  But it might be cleaner to say

 7    everything that goes on during the period of interaction

 8    with customers, everything, maybe not taking out the trash,

 9    but other than taking out the trash, that's all tip

10    producing.

11         What do you say to that?

12         MS. LISS-RIORDAN:  Well, your Honor, the argument

13    that Mr. Rosenthal just made is exactly the reason why we

14    believe it would be confusing to allow such an argument to

15    be made to a jury, because the point is that the law is the

16    law.

17         THE COURT:  No, no.

18         MS. LISS-RIORDAN:  If I could just read to you --

19         THE COURT:  I'm still with you on pre-shift --

20         MS. LISS-RIORDAN:  Yes.

21         THE COURT:  -- and on post-shift --

22         MS. LISS-RIORDAN:  Yes.

23         THE COURT:  -- for this discussion.

24         MS. LISS-RIORDAN:  I know.  But the factual

25    question about whether or not something produces tips is
```

1  confusing to a jury, it was even confusing to many of the

2  plaintiffs.  Because cooking the steak produces tips.  I

3  will agree to that as a factual matter, that the chef

4  cooking the steak leads to tips.  However, the Department of

5  Labor and the FLSA does not allow that to count as a tip

6  producing activity as a matter of law.  So that's --

7          **THE COURT:**  I understand that.

8          **MS. LISS-RIORDAN:**  So that's why -- I'm looking at,

9  the language of the handbook itself says time spent in

10  duties related to the tipped occupation even though such

11  duties are not by themselves directed toward producing tips,

12  i.e., as a matter of law the Department of Labor has decided

13  these are not tip producing; i.e., maintenance and

14  preparatory or closing activities, and then the examples

15  that are given are cleaning and setting tables, making

16  coffee, occasionally washing dishes or glasses.  These

17  duties are not tip producing.  Yet the Department of Labor

18  has determined, because it is the authority on the FLSA, it

19  has the day-to-day experience with restaurants, employers

20  and employers throughout the country and has made the

21  determination of what is a reasonable interpretation of the

22  CFR.  It's just decided as a legal matter these are the

23  kinds of duties that are not tip producing.  Now, where the,

24  it sets forth some examples, and where the exact line is

25  drawn is, as your Honor was indicating, something the jury's

1    going to figure out with your guidance.  You're going to

2    explain to them what some of the examples are that the law

3    says are not as a matter of law tip producing, even though a

4    lay person, even a waitress, may think as a factual matter

5    they are.  Just like cooking the steak as a factual matter

6    is tip producing, the law doesn't allow the chef to be paid

7    less than minimum wage for cooking the steak.

8         So that's why our concern is that allowing Mr.

9    Rosenthal to make a very persuasive factual argument like he

10   just did to your Honor is going to be confusing to the jury,

11   because I expect it may be persuasive to the jury, but as a

12   matter of law that's not what the CFR and the Department of

13   Labor allow.  So --

14        **THE COURT:**  Now, wait a minute.  The, the manual is

15   not law, is it?

16        **MS. LISS-RIORDAN:**  Well, I'm relying on the

17   regulation.  And the Supreme Court has said the Department

18   of Labor can be given deference, it's not binding.  But even

19   when the Department of Labor submits an amicus brief in a

20   case what it interprets its regulation as meaning if there's

21   any ambiguity in the regulation, has been determined by many

22   courts to be persuasive.

23        If you look at the regulation itself it uses very

24   similar language.  A waitress who spends part of her time

25   cleaning and setting tables, toasting breads, making coffee,

1    and occasionally washing glasses, dishes or glasses, such

2    related duties in an occupation that is a tipped occupation

3    need not by themselves be directed for producing tips.

4         Now, the Department of Labor looked at that

5    regulation and it said, Aha, but what do they mean, what

6    does the regulation mean by part of the time and

7    occasionally.  We can't let employers who, restaurant

8    employers let their waitstaff spend 90 percent of their time

9    cleaning and setting tables, toasting bread, and get paid

10   2.13 an hour, we've got to put some cap on that.  The cap

11   that we think is reasonable is 20 percent.

12        So, I agree that some of the lines to be drawn with

13   the running sidework, I think those are the blurriest part

14   of the case and I think ought to be for the jury to decide.

15        THE COURT:  All right, here's, here's what we're

16   going to do.

17        MR. ROSENTHAL:  Judge, may I --

18        THE COURT:  Yes, yes, you may.

19        MR. ROSENTHAL:  Okay.  She relies on the regulation

20   and the regulation says they need not be tip producing.  The

21   issue there is whether or not in a dual job situation you

22   have to pay a tip credit for the whole thing or not.  That's

23   all it decides.  And it says need not be tip producing.  How

24   can that be as a matter of law the determination of the

25   Department of Labor that it is as a matter of law tip

1    producing.

2         What goes on in that restaurant -- your Honor said

3    it to me the other day.  You said, look, I can't make this

4    decision based on my own experience with, I think I used

5    Barclay's burger joint, or Ruth's Chris.  You have to make

6    the decision I think respectfully on the record before you.

7    The record before you says that this is all tip producing

8    activity.  That's just, but that's just one source of the

9    material.

10        This regulation, the one she says she relies on,

11   does not say it's tip producing.  It is only fair that I be

12   allowed to explain, not me, I'm not going to explain it,

13   that the people who work there explain to the jury what it

14   is they feel puts money in their pocket.  And that's what

15   the court, in all of those cases that they cite, that's

16   really what they're saying.  Let's leave that.  And the only

17   case, Judge, the only case right on point is Applebee's.

18        **THE COURT:**  All right.

19        **MR. ROSENTHAL:**  Okay?  And Applebee's says it is a

20   question of fact.

21        **THE COURT:**  Here's how we're going to proceed.  And

22   you may take exception to my charge because we'll actually

23   see it when we see my pretrial charge and ultimately will be

24   all bound by my post-trial charge.

25        But pretrial I'm going to say that pre-shift

1    setting up is not tip producing, post-shift taking down is

2    not -- well, I'm going to say sidework.  I'm not going to

3    define it.  That's sidework.  Post-shift is sidework.

4    During the shift some examples of sidework are resetting the

5    tables, making coffee, taking out the trash.  It's up to you

6    to determine during the shift what is sidework and what is

7    tip producing.  I may be able to do the words better than

8    that.  But that's what we're going to do and that's now part

9    of the pretrial order.

10          Now, the second issue I have, I don't think this is

11   adequately briefed.  It may be a function of my lack of

12   preparedness, and if so, I apologize.  But by this Thursday,

13   close of business, strike that, next Thursday, close of

14   business, the 8th, I want briefs on the -- I don't

15   actually -- I'd like to have this in my mind, but I don't

16   need, I don't know as I need to explain this to the jury.

17   I'm not clear what the measure of damages is here.

18          Let's say the plaintiff is correct that in a

19   restaurant the plaintiff shows that the waitstaff spends

20   more than 20 percent of their time on sidework.  Now, as I

21   understand the law they must be paid at the minimum wage

22   then for the sidework.  Does that mean that they are --

23   let's say that they spend 30 percent on sidework.  Does that

24   mean that they are paid minimum wage for 10 percent, taking

25   them down to the 20 percent, or they're paid minimum wage

1    for 30 percent?

2         Well, you're shaking your head.  You obviously

3    think they're paid the 30 percent.  I'm not clear on it.  I

4    need briefs.  Either rebriefed.  I need to be persuaded that

5    it's the 30 percent.

6         This is in dispute, isn't it, Mr. Rosenthal, you

7    think it's the 10 percent?

8         **MR. ROSENTHAL:**  And that's what she's actually said

9    repeatedly in the papers.

10        **THE COURT:**  Well, you better -- she denies it.  I

11   don't understand.  I need it briefed.  You'll give me a

12   brief.

13        Now, actually I'm going to leave you to discuss,

14   but maybe you have discussed.  We never figured out how we

15   were going to try the case if we get that far, and I

16   earnestly pray that a merciful God will lead you to a

17   resolution of this case.  I'm supposed to say that.  I'd

18   love to try this case.  My only problem with it is it's

19   going to be so long.  And I don't shrink from long cases,

20   but they bollix everything up.  But that's my problem, not

21   yours.  I'd love to try this case, but I really hope you

22   settle.  I wish you would settle.

23        I'm only giving you 20 trial days.  So that's it.

24   But that doesn't mean that the case is then over.  If it

25   cannot be handled in 20 trial days, we'll have to have two

1    trials or three trials or however many trials until the

2    plaintiffs' and defendant's rights are properly adjudicated

3    by a jury.  But for the moment we've got to figure out what

4    we're going to do in that first 20 days.

5           Now, you people have explained to me, accurately,

6    that there's two ways to do it.  We can try it out on a

7    restaurant by restaurant basis, or we can try it out on a

8    representative basis and the people in all the restaurants

9    that have opted in will be bound by the determination.  I am

10   not going to press one -- I'm not going to force

11   representative basis on anyone.  And if -- well, having said

12   that, it's the defendant, I think, that could be prejudiced

13   by that.  And either you're going to agree upon what

14   restaurants we do if it's a representative basis or we're

15   not going to do it on a representative basis.

16          So my question to you is, have you further

17   discussed that, Mr. Rosenthal?

18          **MR. ROSENTHAL:**  We have not, your Honor.

19          **THE COURT:**  Do you want to now, now that you know

20   everything that -- that's, that's going to be my last issue.

21   I want to know what we're doing.

22          And so, I propose now to take no more than a 15

23   minute break, and here's how it's going to work.  If we do

24   it on a representative basis it's got to be by agreement and

25   therefore I assume we've got to agree, one, how many can you

1   do in 20 days, because I'm holding you to that, and two,

2   what the restaurants are.  If we don't do it on a

3   representative basis, she gets to pick.  Plaintiff gets to

4   pick.  Because she's got to go through two, maybe three

5   trials.  She can pick the restaurants she wants.  That's

6   fine by me.  She'll go with her best shot.  If she wins, she

7   wins, but she's got more to prove as to the other

8   restaurants and the thing will have to keep bleeding out.

9        I propose to take a 15 minute recess, come back and

10   have you tell me the answer.  And then if we're not going to

11   have it on a representative basis, I want to know by

12   Thursday, close of business, which, tell the defense, and I

13   want to know which restaurants and how many, and you can put

14   in as many as I will bind you to 20 days.  That means, that

15   means 35 hours on your feet for plaintiff and 35 hours on

16   their feet for defense.

17        Yes, Mr. Rosenthal?

18        **MR. ROSENTHAL:**  A quick question, your Honor, so we

19   can discuss this.  You had indicated yesterday, and I think

20   it's actually in your notes that were published, that this

21   was going to be a bifurcated case.  And so that --

22        **THE COURT:**  Oh, I didn't speak to that.  Yes.  And

23   now, now I understand how I'm going to do it.

24        That is a principled decision, but I am not going

25   to refer out the damages calculation to anyone.  The proper

```
 1    way to do it is for me to handle it myself.  Because I will

 2    be the judge who's -- reading the cold record makes sense.

 3    I will sit there and take adequate notes to make findings

 4    and rulings on damages, and if there is additional evidence

 5    that goes only to damages, a spreadsheet, and a witness to

 6    explain it, we'll just do that in the afternoons since I sit

 7    9:00 to 1:00.  I've done other, not identical cases, but

 8    other cases that way.  And if I won't give you the afternoon

 9    we'll sandwich it in as close as we can so I get the

10    additional evidence as to damages.  I'll decide the damages.

11    Maybe in the back of my mind that's why I need these briefs

12    as to how to quantify them.  But we will not give that issue

13    to the jury, you're right.  Okay?

14         MR. ROSENTHAL:  And that will be done, I assume,

15    after the, after the jury trial with regard to liability.

16         THE COURT:  It will be announced after the jury

17    trial as to liability, but maybe I'll be -- well, I'll be

18    close to doing it.  In the sense that the jury will make its

19    verdict as to liability, I will say, well, now let's have

20    closing arguments as to damages, and we'll, assuming they

21    win, and then I'll either, if it's simple, do it from the

22    bench, probably I can't, but if it's not, I will take it

23    under advisement and do it.

24         MR. ROSENTHAL:  So the damages would then be in the

25    afternoon, or it would be liability in the morning, damages
```

1  in the afternoon.

2          THE COURT:  Precisely.

3          MR. ROSENTHAL:  Thank you.

4          THE COURT:  As you said and you persuaded me, the

5  things are pretty inextricably intermingled.  So I am not

6  thinking there's going to be a great deal of independent

7  damages evidence.  Am I correct?

8          MR. ROSENTHAL:  I think not, Judge.  I think that

9  there will be -- and that's why I thought we had sort of

10 discussed doing this outside of the, outside of the other

11 issues in the trial.  Because there could be testimony, for

12 example, that in a certain restaurant during a very limited

13 period of time people work more than 20 percent.  That

14 doesn't mean that that's happened someplace else.  So, we've

15 got, we've got 400 people here and those situations are

16 going to be different as to each.

17         THE COURT:  But you see the way I approach that is

18 on a restaurant by restaurant basis.  And that's why the

19 discussion you're now going to have for no more than 15

20 minutes is going to inform me.

21         Let's say she thinks she can do -- let's say, if

22 you agree upon -- the way you're talking, it doesn't sound

23 like you're going to agree.  But maybe you will agree

24 because she will compromise and you'll get to pick some

25 restaurants and there we are.

1             If we do it on a representative basis, then while

2     the result may be different as to various -- well --

3             MR. ROSENTHAL:  But how do you do that, Judge?  I

4     mean --

5             THE COURT:  Because we're going to do it on a

6     percentage.  Well, well, that's interesting.  I don't know

7     how.

8             MR. ROSENTHAL:  You know, you know --

9             THE COURT:  Now that you say it, I don't know how.

10            MR. ROSENTHAL:  You know, the scheduling of these

11    folks is different.

12            THE COURT:  That's right.  Let's say you pick eight

13    restaurants, you say we'll do it representative, we pick

14    eight restaurants.  You win on four, Ms. Liss-Riordan.  What

15    does what mean?  It means you've won on those four and he's

16    won on four.  What about the rest of the restaurants?  I

17    can't -- that quantifies, in a representative way it

18    quantifies Ruth's Chris damages overall, but we don't know

19    who to give it to.  Do you see?  Then we're into a

20    hearing -- the only people who win -- he wins on four, you

21    win on four, but there are 16 restaurants.  I'm just making

22    this up.  So, for -- he's going to win on eight and you're

23    going to win on eight.  But which ones?

24            MS. LISS-RIORDAN:  Right.  I think -- maybe we need

25    to have a little time to process what you said.  But some of

1   my initial reactions are if we do it on a representative

2   basis, we're asking the jury to decide based on these

3   representatives yes or no did we prove that on a class wide

4   basis the sidework exceeds 20 percent.  And then we thought

5   there would be separate proceedings for, if we waived a jury

6   on damages, for your Honor to determine what the damages

7   are.  If you're envisioning that this is all going to be

8   presented at the same time, I think that might change my

9   thinking a little bit about this.  It might then be an

10   appropriate jury question for the jury to say, yes, it

11   exceeds 20 percent and the percent is 30.  And then it would

12   be for you really as more ministerial action to do the math

13   based on the hopefully undisputed numbers we can give you on

14   whatever was paid --

15          **THE COURT:**  Okay.

16          **MS. LISS-RIORDAN:**  -- you know, what the tip credit

17   would come to.

18          **THE COURT:**  This actually is helpful because I'm

19   not sure I understood.  I can conceive of doing it on a

20   class wide basis if he agrees.  I am not going to force it

21   on him.  Of course if he agrees then you both are taking the

22   appropriate chance, you agree on what restaurants, and you

23   will either win, and that will be applied across the Ruth's

24   Chris class, or you lose and the whole class has lost.

25          **MS. LISS-RIORDAN:**  Right.

 1          **THE COURT:**  If you want to do that, that's fine.

 2  If you don't want to do that it's an individual restaurant

 3  basis and you get to pick the ones you start out with.  And

 4  I will tell you I'm thinking of giving it to the jury what's

 5  the percentage, that's, that's the issue.

 6          **MS. LISS-RIORDAN:**  Yes, I think that's right.

 7          **THE COURT:**  They're not going to find specific

 8  facts.  They're going to say what's the percentage.  If we

 9  do it on a restaurant by restaurant, the verdict slip will

10  say what's the percentage for this one, that one, and the

11  other one.

12          **MS. LISS-RIORDAN:**  Right.

13          **THE COURT:**  And you may win on some, lose on

14  others.  And having presided over the case it was my intent

15  to do the more ministerial, when I've got the individual,

16  you know, hours worked and stuff, and I expect you to help

17  me decide who wins what.

18          Now, I can go either way.  You've got 15 minutes to

19  tell me, but you get no more than a month trial, which will

20  start on the 19th and a Magistrate Judge will impanel.  So

21  on that day that's all we're doing is impaneling, because we

22  want to do precharge and openings the beginning of the next

23  day.

24          I'm going to recess for 15 minutes.  You can take

25  less time, and if you can't agree, it's restaurant by

 1    restaurant because I'm not forcing representative on Ruth's

 2    Chris.

 3            But after 15 minutes I'll come out and answer any

 4    questions, and I thank you for the time.

 5            We'll recess.

 6            **MS. LISS-RIORDAN:**  Thank you.

 7            **THE CLERK:**  All rise.  Court is in recess.

 8            (Recess.)

 9            **THE CLERK:**  All rise.  Court is in session, please

10    be seated.

11            **THE COURT:**  All right, Ms. Liss-Riordan, how are we

12    going to proceed?

13            **MS. LISS-RIORDAN:**  Well, Mr. Rosenthal tells me the

14    defendant is not agreeing to do representative --

15            **THE COURT:**  But I'm not -- it doesn't trouble me

16    and it may make good sense for him.

17            That being so, you will by the close of business on

18    Thursday, the 8th, tell me which restaurants and you -- now,

19    fill up 20 days.

20            **MS. LISS-RIORDAN:**  Well, that was another question

21    we had --

22            **THE COURT:**  Yes.

23            **MS. LISS-RIORDAN:**  -- for you.  What we had

24    suggested in our pretrial memo is we thought the case, well,

25    as we had posited, it could be done in three weeks.  So my

1  question is, since we're talking about this being the first

2  of potentially serial trials --

3          **THE COURT:**  Yes.

4          **MS. LISS-RIORDAN:**  -- we may want to, could we let

5  you know Thursday whether we want to use the whole four

6  weeks or can we just --

7          **THE COURT:**  I think that, I think that makes sense,

8  because it's no secret I'm hoping private ordering will take

9  over.

10         So, you don't object if she wants to do a briefer

11  trial, do you?

12         **MR. ROSENTHAL:**  A briefer trial?

13         **THE COURT:**  A briefer trial.

14         **MR. ROSENTHAL:**  A briefer trial.  I was thinking,

15  Judge, that you gave us a certain amount of time, each of

16  us, to do what we wanted to do.  I don't know, I don't know

17  what she's thinking frankly now because she wanted some time

18  to think about it.

19         **THE COURT:**  No, she'll tell you on Thursday how

20  many restaurants and she'll, and which they are, and she'll

21  tell you how long in the aggregate she expects that to go.

22  Now, if you think in the aggregate that's going to take

23  longer feel free to tell me --

24         **MR. ROSENTHAL:**  Okay.

25         **THE COURT:**  -- likewise.  But, I have no objection

1    to you -- and keep on talking.  Keep not only talking

2    settlement, but talk the trial management.

3           But the short answer to your question is yes, I'll

4    go for a shorter trial hoping you'll settle between trial

5    one and trial two.  And if that -- one, that saves the

6    plaintiffs money, and I don't, I don't see how the defendant

7    is prejudiced since we're going restaurant by restaurant.

8           So, I urge you not to object to that if she wants a

9    shorter trial.

10          **MR. ROSENTHAL:**  Yes.

11          **THE COURT:**  But I'm not for one restaurant in a two

12   day trial so we do an exemplar case and then I have -- over

13   the 400, how many restaurants do I have here?

14          **MS. LISS-RIORDAN:**  There are, I believe there are

15   about 50 something restaurants.

16          **THE COURT:**  Yes.  I'm not going to do 50 cases.

17          **MS. LISS-RIORDAN:**  Right.  We were thinking

18   probably between three and five if that --

19          **THE COURT:**  And if you can do that in three weeks,

20   that's fine.  But, since I want to know the time limits and

21   tell the jury, because it makes for a happier jury and I can

22   schedule my, my own work then better.

23          No, a shorter trial is fine since it will only

24   affect those in those restaurants.

25          Any other questions I should answer now?

1          **MR. ROSENTHAL:**  Judge, since this legal issue is

2     very important to the case would you consider a 1292(b)

3     appeal on that legal issue with regard to tip production?

4          **THE COURT:**  I would consider anything.  I'm not

5     likely to certify it.  Simply because I believe, as I think

6     the First Circuit believes, that final full case, what is

7     it, full case adjudication is the appropriate review.  If we

8     do a shorter one, the good break point, if you want to

9     appeal, would be then.  Now, don't think I'm going to wait

10    for the appeal to be decided before I do the next of the

11    cases.

12         The short answer is I would consider it but I'm not

13    likely to allow it.

14          (Whereupon the Court and the Clerk conferred.)

15          **THE COURT:**  Ms. Smith reminds me that we got tied

16    up on this and some of the normal things I say in a pretrial

17    conference I never got to.  You're familiar with how I try

18    cases, but let's, let's go over it.

19         I will impanel twelve jurors.  You will each have

20    six peremptory challenges.  You know how I impanel juries

21    but feel free to ask.  There will be no alternates.  I do

22    expect prior to the 19th, given whatever we ultimately agree

23    will be the restaurants that will be tried, to have an

24    exhibit list.  The exhibit list will list and give numbers

25    to all the exhibits that, to which there will be no

1    objection.  The numbers will not be a Plaintiffs' 1 and a

2    Defendant's 1, but just numbers from 1 on.

3           As to all those exhibits where there is an

4    objection you will give them letters.  The letters will go

5    to the base 26, by which I mean A to Z, then AA, AB, AC, not

6    AA, BB, CC.

7           You need not explain the grounds of objection --

8    I'm trying to keep the costs down -- unless the ground of

9    objection is authenticity, and then all you need say is

10   authenticity, which will key me in to making sure the

11   foundation is laid very square for that exhibit.

12          We will -- I will set, with your agreement, a time

13   limit.  So I need to know in the submission on Thursday how

14   long, and I need to know, if you don't agree with that, then

15   I will set a reasonable time limit.  But I'm hoping you'll

16   discuss this and work this out.

17          And I think those are the usual things.  I do -- I

18   don't require that Thursday, the exhibit -- I don't require

19   that really to the morning of the trial.  But I need it and

20   I want it.  And you may want to alter your witness lists if

21   we're going to shorten the trial.

22          Any other questions?  I hear none.  A simple phone

23   call to Ms. Smith that the case is settled is all that's

24   required.  Don't ever make that -- all that's required in

25   this sense.  If you make that phone call we'll close the

1   case, but we will be sweet reasoned as to however long you

2   need to file the settlement documents or whatever you want

3   to put on the record.  You work that all out.  And I will be

4   amenable to whatever time schedule you want.  The whole idea

5   is to encourage settlement.  There's no time beyond which

6   you could settle.  You could settle on the eve of trial and

7   I won't be disturbed.  But the earlier you settle the better

8   off it is for my schedule.

9        Don't ever make that phone call and then have the

10   settlement come unwound.  I will do everything lawful to

11   make you wish you had not done that.  I will say that it's

12   now a contract case and I don't have jurisdiction, and I

13   will say in any event you have to get all new lawyers

14   because you people are witnesses to the settlement.  I will

15   say you are judicially estopped, and I will say other

16   things.

17        So, absolute grease the wheels towards settlement,

18   but I don't want it to become unwound.  Other than that I

19   look forward to seeing you.  Actually I'll see you on the

20   20th, but I'll be set up so it can be impaneled in this

21   courtroom on the 19th before a Magistrate Judge.  And I

22   thank you.

23        **MR. ROSENTHAL:**  Thank you, your Honor.

24        **THE COURT:**  We'll stand in recess.

25        **MS. LISS-RIORDAN:**  Thank you, your Honor.

1          MS. SCHWAB:  Thank you.

2          THE CLERK:  All rise.  Court is in recess.

3          (Whereupon the matter concluded.)

4

5

6               C E R T I F I C A T E

7

8

9          I, Donald E. Womack, Official Court Reporter for

10   the United States District Court for the District of

11   Massachusetts, do hereby certify that the foregoing pages

12   are a true and accurate transcription of my shorthand notes

13   taken in the aforementioned matter to the best of my skill

14   and ability.

15

16

17

18

19          /S/ DONALD E. WOMACK 10-6-2009
        _____
20              DONALD E. WOMACK
            Official Court Reporter
21              P.O. Box 51062
         Boston, Massachusetts 02205-1062
22            womack@megatran.com

23

24

25